NOT DESIGNATED FOR PUBLICATION

No. 124,122

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF SALINA,
*Appellee*,

v.

SANDRA FAY DAHL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed May 6, 2022. Affirmed.

*Allie J. Burris*, of Blackwell & Struble, LLC, of Salina, for appellant.

*Jeffrey A. Norris*, of Clark, Mize & Linville, Chartered, of Salina, for appellee.

Before GARDNER, P.J., HILL and ISHERWOOD, JJ.

PER CURIAM: Sandra Fay Dahl appeals her conviction of driving under the influence in violation of a city ordinance, challenging the sufficiency of the City of Salina's evidence at trial. Because a rational fact-finder could conclude from the evidence that Dahl operated a vehicle while under the influence of drugs to a degree which rendered her incapable of driving safely, we affirm the jury's verdict.

1

*Factual and Procedural Background*

At around 1 a.m. one morning in June 2020, Dahl drove to a Kwik Shop to buy milk. While pulling into a parking spot, Dahl hit the side of the building. She then entered the building, told the worker she had hit the building, bought her milk, and returned to her vehicle to go home.

Someone reported Dahl to the Salina Police Department, describing Dahl's vehicle as an orange Pontiac and explaining that Dahl might be impaired. Dispatch sent Officer Mallory Wiggins to investigate. On her way to the Kwik Shop, Wiggins saw Dahl's vehicle and followed it. As Wiggins caught up to Dahl, Dahl swerved toward a parked car. So Wiggins activated the emergency lights on her patrol vehicle and initiated a traffic stop. Dahl pulled over but proceeded into an intersection before coming to a full stop.

After approaching Dahl, Wiggins asked Dahl to turn off her car and provide her driver's license and proof of insurance. Dahl struggled to comply with Wiggins' request to turn off her vehicle, first turning her blinker on and then turning the radio down. Dahl searched through the documents in her car and initially provided her driver's license and registration, but eventually provided proof of insurance too. Wiggins noted that Dahl's movements appeared slow. She also noticed that Dahl's speech was slurred and thus asked Dahl to remove her face covering, presumably worn to protect against the spread of COVID-19, so she could hear Dahl better. But even after Dahl removed her face mask, Wiggins had trouble understanding Dahl because of her continued slurring.

Soon after she began speaking with Wiggins, Dahl admitted she had struck something at the Kwik Shop. She later complied with Wiggins' request to exit the vehicle to perform tests to investigate possible impairment. Officer Erik Bloom, who had also responded to the stop, then took over the investigation.

Bloom conducted a standardized field sobriety test. He asked Dahl to complete a walk and turn test using a line drawn on the ground with chalk. Dahl told the officers she had trouble seeing the line because she had a cataract, but she completed the test anyway. Bloom determined that while completing this test, Dahl exhibited all eight indications of intoxication that the test could show.

After more testing, Bloom also determined Dahl could not accurately complete a one-leg standing test and could not accurately count backward from 50 to 40. Dahl blamed her cataract and the lights on the police vehicles for her inability to complete some of the tasks, including the one-leg standing test.

A third officer, Rachel Larson, eventually joined Bloom and conducted more roadside testing. When Larson asked Dahl whether she was taking any medications, Dahl answered that she took a prescription medication for high blood pressure in the mornings and Ambien and Klonopin at night. Dahl described the dosage of each medication but "flip flop[ped] the two medication dosage units several times." Dahl denied having taken any prescription medications before driving that night, saying she had taken only her blood pressure medication the morning before. She told Bloom she had taken a thyroid medication and a vitamin the morning before, but then later stated she had taken her blood pressure medication and a vitamin.

Larson asked Dahl to complete another balance test. Dahl's results showed to Larson that Dahl was under the influence of a depressant drug. Larson also noticed that Dahl's eyes were red and bloodshot and her speech was "extremely slurred."

While the other officers finished the roadside tests, Wiggins investigated the possibility that Dahl had hit a parked car. The parked car had a broken mirror and marks of orange paint. Wiggins knocked on the door of the house the car was parked in front of.

The primary driver of the car, Tony Wood, answered the door, looked at the damage, and told Wiggins the damage had not been there roughly an hour earlier.

After the officers completed their investigations, Bloom arrested Dahl. Bloom then got a search warrant and drove Dahl to a health center to have her blood drawn for testing. Phlebotomist Tambera Currier drew Dahl's blood, and toxicologist Kayla Horst, tested it. According to Horst, Dahl tested positive for Zolpidem, Clonazepam, and 7-Aminoclonazepam.

*Municipal Court Proceedings*

The City charged Dahl with violating Salina City Code § 38-1, Standard Traffic Ordinance for Kansas Cities (STO) § 30(a)(4) (48th ed. 2021), for driving under the influence of any drug or drugs that rendered her incapable of driving safely. Dahl's case was tried to a judge in municipal court. The municipal court found Dahl guilty, so she appealed to the district court.

*District Court Proceedings*

The district court granted Dahl's request for a jury trial. At trial, Dahl testified on her own behalf. The City presented testimony from the three officers (Wiggins, Larson, and Bloom), the professionals who drew and tested Dahl's blood (Currier and Horst), and Wood. The City also admitted Horst's toxicology reports, and the officers' dashcam and body camera footage of the stop, roadside testing, and arrest.

The City also elicited testimony describing the blood-draw procedures and test results. Currier described the procedure she used in collecting Dahl's blood and testified that nothing unusual occurred during the blood draw. Currier also explained that she did not restrain Dahl or forcibly collect any blood samples.

Horst explained that 7-Aminoclonazepam is a metabolite of Clonazepam. Horst described the three drugs that Dahl tested positive for as central nervous system depressants that slow body reactions. Horst categorized Clonazepam and 7-Aminoclonazepam as benzodiazepines and Zolpidem as a "sedative hypnotic." Horst explained that these medications are generally prescribed as sleep aids. She also testified that Clonazepam stays in a person's system for around 19 to 60 hours but could be detected for up to a week; Zolpidem lasts between 1.5 to 4.5 hours.

Dahl admitted to the jury that she ran into the Kwik Shop with her car and that she was prescribed Zolpidem and Clonazepam as sleep medications. She also testified that she regularly takes each before going to bed and acknowledged that the medications warned not to drive after taking them. Dahl, however, denied taking any sleep medications before driving on the night she was arrested and maintained she was not under the influence of any drugs or alcohol that evening. Dahl instead suggested that the officers mistook her age (70) and physical limitations as insobriety.

After the City closed its evidence, Dahl moved for a judgment of acquittal but the district court denied her request. After deliberation, the jury found Dahl guilty and convicted her of driving under the influence of drugs. The district court sentenced Dahl to six months in jail but granted her one year of probation.

Dahl timely appeals.

*Does Sufficient Evidence Support the Verdict?*

Dahl challenges only the sufficiency of the City's evidence against her at trial. She tacitly concedes that she did not drive safely on the night police arrested her but claims the evidence fails to show she was impaired by drugs.

5

*Standard of Review and Basic Legal Principles*

In reviewing a challenge to the sufficiency of the evidence to support a conviction, this court reviews the trial record in the light favoring the prosecution and draws all reasonable inference in support of the guilty verdict. We do not reweigh the evidence and ask simply whether the evidence could reasonably support the verdict. *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018); *State v. Butler*, 307 Kan. 831, 844-45, 416 P.3d 116 (2018); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006).

"[A] DUI conviction, like any conviction, can be supported by direct or circumstantial evidence." *State v. Perkins*, 296 Kan. 162, 167, 290 P.3d 636 (2012). "Circumstantial evidence may support a conviction, if such evidence provides a basis from which a reasonable factfinder may reasonably infer the existence of the fact in issue." *State v. Darrow*, No. 109,397, 2014 WL 1887629, at *2 (Kan. App. 2014) (unpublished opinion), *aff'd* 304 Kan. 710, 716, 374 P.3d 673 (2016).

*Sufficient Evidence Supporting Dahl's Conviction*

Salina's city code incorporates the STO by reference. Salina City Code § 38-1. The jury found Dahl guilty of violating STO § 30(a)(4), which is like K.S.A. 8-1567(a)(4) and provides: "Driving under the influence is operating or attempting to operate any vehicle within this city while . . . [u]nder the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle."

Most of Dahl's argument tries to reframe the evidence to show another plausible explanation for her actions—her age and physical limitations. She distinguishes her case from *State v. Moore*, 35 Kan. App. 2d 274, 283, 129 P.3d 630 (2006). There, a defendant drove his truck over 100 yards into a field, accidentally called 911 instead of a tow

6

service for help, admitted to drinking, and showed significant signs of alcohol impairment.

We decline Dahl's invitation to reweigh the evidence and instead view it in the light most favorable to the City. See *Jenkins*, 308 Kan. 545, Syl. ¶ 1. The uncontroverted facts show that a reasonable fact-finder could have found Dahl guilty of DUI under STO § 30(a)(4) because they prove Dahl:  (1) ran her car into a building; (2) admitted she took at least one prescription medication the same day; and (3) tested positive for Zolpidem, Clonazepam, and 7-Aminoclonazepam, which slow a person's motor skills. Cf. *City of Salina v. Clemence*, No. 88,701, 2003 WL 27393911, at *2 (Kan. App. 2003) (unpublished opinion) (affirming conviction for driving offense under Salina city ordinance as supported based on uncontroverted evidence showing defendant backed into a legally parked vehicle). Dahl also admitted at trial that she knew her prescription sleep medications included a recommendation not to drive after taking them.

The officers described Dahl as being unable to comply with clear instructions and having delayed and slurred speech, bloodshot eyes, and delayed reaction times. The jury also watched the video footage showing Dahl's slurred speech and other behaviors. At trial, Dahl challenged the officers' descriptions as inaccurate, but she did not testify that she typically exhibits those characteristics or blame them on her age or physical limitations. She also admitted that other than a cataract in her left eye, she did not suffer from any physical ailments while completing the officers' roadside testing. She admitted that her cataract did not interfere with her ability to understand the officers' instructions. And Dahl tacitly concedes on appeal that she did not drive safely by admitting she "should not [have] be[en] driving" that night.

Wiggins also found evidence that Dahl likely hit a parked car after leaving the Kwik Shop. Wood provided supporting testimony, explaining that the damage to the driver's side mirror had been caused that morning.

7

Although Dahl claims she did not take any sleep medication before driving, the City's evidence proved otherwise. She tested positive for all three types of her prescribed sleep medications. Dahl testified that she usually took her medications just before going to bed. According to her statement to Larson as seen in the body camera footage admitted at trial, Dahl usually went to bed around 10:30 or 11 p.m. but took her last dose of sleep medications the night before at around 11:30 p.m. Because Dahl made this statement at around 12:30 a.m., it seems Dahl had around 25 hours to physically process any medications she took the night before. But Dahl tested positive for Zolpidem, which Horst testified stays in a person's body for only 1.5 to 4.5 hours, shortly after her arrest. So the evidence shows Dahl likely took Zolpidem shortly before driving to the Kwik Shop. This is sufficient proof Dahl was under the influence of a drug or drugs under STO § 30(a)(4).

We are convinced that a rational fact-finder could have found Dahl guilty of DUI under STO § 30(a)(4) beyond a reasonable doubt.

Affirmed.